[Crim. No. 15900. Second Dist., Div. Four. Feb. 19, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES KENNETH RANDOLPH, Defendant and Appellant.

656

## COUNSEL

Joseph T. Vodnoy and Gerald Krupp for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON, Acting P. J.**—Defendant was charged, in two counts, with the murders of Charles Metoyer and Thomas Sims. A prior felony conviction was alleged, which defendant admitted. Defendant was tried by a jury and found guilty of murder in the first degree as to each count. This was defendant's second trial, the first trial having ended with a mistrial being declared when the jury was unable to reach a verdict. The court fixed the penalty at life imprisonment. Defendant appeals from the judgment.

On the evening of July 13, 1967, defendant was "shooting dice" at the apartment of Thomas Sims, one of the victims. In addition to defendant and Sims, also present were Clifford White, Joseph Chryar and Charles Metoyer, the other victim. Neither White nor Metoyer took part in the gambling. After about 30 minutes Chryar quit, having lost all of his money (about $110) to Sims. About 15 minutes later defendant also ran out of money. Sims had won about $80 from him. After going into the kitchen where he "snorted" (sniffed) some cocaine from a balloon, defendant came back to the living room and talked to Sims about shooting some more dice later. Defendant, White and Chryar then got up and went outside. Sims and Metoyer remained in the apartment. When they got outside in the hallway, defendant asked White if he had any money. White said "No." Defendant then asked Chryar the same question. The latter told defendant that he had no money either. Defendant then turned to White, and Chryar heard defendant tell White, "Man, I am going to get my money back. You take this gun and I will keep this one. We are going back in here and get my money back. This is all right with Joe (referring to Chryar)." At the same time Chryar saw defendant hand White a pistol (People's Exhibit 4-A). White appeared at the time to be "high" on narcotics or alcohol. They then reentered the apartment and defendant told Sims that they were back to do some more gambling. Sims sat down on the floor ready to play. Metoyer was standing in the bedroom doorway watching. White then pulled out the gun defendant had given him and said "everybody stand beside the wall." Sims, who was still on the floor, said "You don't have to do this because if you want the money, here it is." He then threw his money on the floor. Defendant was standing next to White and a little behind him. White then told Sims, "I said stand up to the side of the wall and that is what I mean." Almost simultaneously he fired the gun at Sims striking him

before he could rise to his feet. When Chryar saw this he "took off out of there." As he ran out of the front door of the apartment, he heard another shot. When he reached the street he heard the sound of breaking glass followed by one or two more shots. After running for some distance he got a ride home. Later the same night he heard someone outside of his apartment. It was defendant. He recognized defendant's voice calling his name. He was frightened and hid on the floor next to the bed. He did not answer defendant's calls. Defendant remained in the vicinity of the apartment about two hours before leaving. Chryar was afraid that he "might get killed" and he subsequently went into hiding, letting it be known that he had moved to Texas. (The above evidence was derived from the testimony of Chryar.)

During the early morning hours of July 14, 1967, Manuella Johnson saw defendant and Clifford White drive by Cooper's Doughnut Shop. They stopped and got out and she talked to defendant. She had known him for about a year. Defendant told her that two guys had been shot; they had been shooting dice with them and White thought that the guys were using crooked dice; that White jumped up and told the guy that he must have thought he was a fool; the guy told White "don't shoot, just take the money"; that "White shot the guy anyway"; that "another guy ran for the bedroom"; White "pushed the door in and shot him too"; that, at the time, "everybody else was lined up against a wall," but "Joe Chryar managed to run." Miss Johnson also recalled that defendant told her that "the guns had been buried." She further recalled that defendant had said that "one guy had tried to go out the window"; that "he had already been shot." After talking with defendant, Miss Johnson drove in defendant's car with defendant and White past the scene of the shooting. As they passed by she observed a black coroner's truck parked in front. Defendant dropped her off about half an hour after she had been picked up.

At about 1:10 a.m. on July 14, 1967, Officer Souza, responding to a call, arrived at the scene of the shooting. He found Sims lying in a pool of blood on the sidewalk about 75 feet from the apartment. Inside, the officer found the body of Metoyer lying on the bedroom floor. There was a trail of blood from the bedroom window, which was broken, to the spot that Sims was found.

Autopsy reports indicated that both Sims and Metoyer died as the result of gunshot wounds. The bullets or fragments of bullets recovered from the bodies were of .38 caliber origin. They could have been fired from People's 4-A which subsequently was found buried in a flower bed. Another gun, a .22 caliber pistol, was found buried with it. People's 4-A was the gun Chryar saw defendant hand to White before the shooting. Chryar had seen both guns in defendant's possession on prior occasions.

Defendant was arrested on July 21, 1967. Officer Dredd spotted his car at an intersection. At the time there was an all-points bulletin out for his arrest. White and Manuella Johnson were in the car with him. All three were arrested.

The evidence presented is amply sufficient to support defendant's conviction and he does not contend otherwise.

Defendant contends, however, that his constitutional rights were violated because he was not notified about, and permitted to be present at, a proceeding at which an order was signed granting the witness Chryar immunity from prosecution under Penal Code, section 1324. Defendant suggests that the witness's immunity proceeding was a "critical stage" of the proceeding against him.

As set out above in the statement of the facts, Chryar testified, under questioning by the People, that just before the shooting he saw defendant hand Clifford White a pistol (People's Exh. 4-A), and tell him "We are going to get my money back." On cross-examination, the defense elicited that Chryar had told a different story both at the first trial (which ended after a jury deadlock) and at the preliminary hearing, as well as at White's trial. Chryar testified that, although he had been granted immunity from prosecution in the previous proceedings, he had not said anything about having seen defendant pass the gun to White, or about having heard defendant tell White they were going back in and get his money back. Chryar explained that he did not tell what actually happened because he was afraid for his life and because he thought that to do so might incriminate him. It was further elicited that Chryar had been told by the district attorney that he would again be given immunity from prosecution, and that such immunity would include immunity from any perjury charges arising out of his false testimony at the previous proceedings.

Following this testimony, a conference took place between the court and counsel outside of the presence of the jury. Counsel for defendant informed the court that he had just discovered that, on the previous Friday, the court had signed an ex parte order granting Chryar immunity under Penal Code, section 1324. Counsel stated that he had not been informed of this proceeding and that he believed it was violation of defendant's rights not to have been informed and allowed to be present to show cause why immunity should not have been granted. Whereupon, defense counsel made a motion for a mistrial which the court denied.

The court's denial of the motion was proper. Under California law, the grant of immunity is governed by section 1324 of the Penal Code. Section 1324 provides that, upon the refusal of a witness to answer a question on

grounds of self-incrimination, where the district attorney requests in writing that the court order the witness to answer, a hearing is held on an order to show cause directing the witness to show cause why he should not be ordered to answer. Unless the court finds that ordering the question answered would be contrary to the public interest or could subject the witness to criminal prosecution in another jurisdiction, the court must order the witness to answer, and the witness must comply with such order. After complying, the witness may not be prosecuted for or on account of any fact or act revealed by his testimony which fact or act, but for such order, he could have refused to answer on grounds of self-incrimination.

As is readily apparent even from a cursory reading of section 1324, the hearing provided for therein, does not, in any way, concern the defendant on trial. It concerns only the witness who refuses to answer. Contrary to defendant's assertion, the section 1324 hearing was not a "critical stage" of the criminal proceedings against him; it was not a stage of the proceedings against him at all.

Defendant maintains that his case was prejudiced because he was not informed beforehand by the district attorney that Chryar would change his testimony. No authority has been cited, nor do we know of any, which would require the prosecution to inform the defense in advance as to what the testimony of its witnesses will be. But, in any event, the record shows that defendant was forewarned about the change in Chryar's testimony. In his opening statement, the district attorney stated that testimony would be introduced that, when defendant, White and Chryar went outside Sims' apartment, "Chryar sees the following: He sees Randolph (defendant) pass White—what is described as a .357 Magnum which will later be identified as the murder weapon, to White. The following conversation takes place. He says Randolph—Randolph says to White, I am going to get my money back. Here take this. I will keep the other gun and we will go back, or I will go back and I will rob him. It is okay with Joe." Thereafter, when counsel for defendant remarked at the time he made the motion for a mistrial, that he had no notice of what the witness would say, the court corrected him, stating: "You were told in the opening statement that this was coming. We had a conversation about it in chambers. You indicated a knowledge of the witness' changing of his testimony. You knew that he had previously been granted immunity in the previous trial. If you need more time now to prepare, I am ready to give it to you, but I can't see in what way the defendant has been prejudiced one slight bit." During the ensuing discussion with defense counsel, the court stated (at two different points) that, if counsel wanted a continuance for additional time for preparation, the court would grant him a continuance. ■ Since no

request for a continuance was made, defendant is not in a position to complain that he was taken by surprise.

 Defendant contends that it was prejudicial error for the trial court to permit the prosecution to elicit testimony that he earned his living by pimping. Chryar was permitted to testify over defense objections that defendant was a "pimp" and that White was his "henchman" or "flunky." The testimony concerning defendant's relationship to White, which indicated that White acted as defendant's agent, was highly relevant and clearly admissible to show that White was acting under orders from defendant when he pulled the trigger. The additional testimony that White was acting as defendant's agent in the illegal activity of pimping, was also relevant evidence. It may reasonably be inferred that, if White was defendant's agent in that illegal business, he would be more inclined to follow defendant's orders to commit other illegal acts—to wit, robbery and murder. We conclude that the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed any prejudicial effect. (See *People* v. *Schader,* 71 Cal.2d 761, 772 [80 Cal.Rptr. 1, 457 P.2d 841].)

 Even if we were to conclude that the trial court erred in admitting such evidence, a reversal would not be required because we could only conclude that the error was harmless. (Cal. Const., art. VI, § 13; *People* v. *Covert,* 249 Cal.App.2d 81, 92 [57 Cal.Rptr. 220].) The question of defendant's guilt or innocence was not a close question. His guilt was firmly established. On the matter of his disposition toward illegal activities, the jury was aware from admissible evidence that, at the time of the shooting, he was actively engaged in illegal gambling and that he was taking narcotics as well. Making the jury aware of the additional fact that his occupation was also illegal, added very little under the circumstances. It would not be reasonably probable that, had the jury not been informed of defendant's business, it would have reached a different verdict. (See *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Kingsley, J., and Dunn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 15, 1970. Peters, J., was of the opinion that the petition should be granted.